JEFFERY P. BOTSFORD,

      Petitioner,

v.                                          CASE NO:  8:11-CV-1025-T-30TGW

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

_____/

## ORDER

Petitioner Jeffery P. Botsford, an inmate in the Florida penal system proceeding *pro se*, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. #1).  The Court has considered the petition, Respondent's response (Dkt. #18) and Petitioner's reply (Dkt. #21).  Upon review of the parties' arguments and the record,  the Court concludes that the petition should be denied.

### Background

Botsford was found guilty by a jury of lewd or lascivious molestation by a person eighteen (18) years of age or older upon a child twelve (12) years of age or older, but less than sixteen (16) years of age.  Jessie, the victim, was a 12 year old babysitter for Botsford, age 38, and his wife, Jennifer Bermudez.  Danielle, also under the age of 14, was another babysitter for the Botsfords.

At the trial, a video, photos, and CD stills made from the video depicting nude images of Jessie and Danielle were introduced as evidence. Jessie testified she spent one night in the Botsford home after babysitting. She took a shower that night in the master bathroom. Botsford and his wife came home around 12:30 a.m. or 1:00 a.m. Bermudez went to check on the children and then went into the master bedroom to go to bed. Botsford initially went into the bedroom, but came out and called Jessie to the kitchen.

Botsford asked Jessie if she had ever had a mudslide and then made the alcoholic drink for her. Jessie said she never had consumed alcohol before this night. Botsford told her to drink it because it tasted like chocolate. She drank several drinks until her stomach felt upset.

After consuming the drinks, Botsford suggested they go into the playroom to play a Nintendo golf game. Botsford went into the playroom with Jessie and closed the door. Jessie was wearing a loose, cotton t-shirt with a bra and underwear with cotton shorts. Jessie said she became nauseated and was feeling the effects of the alcohol so she leaned back on the floor. While she was lying there, Botsford began to touch her stomach and ran his hand up her stomach and touched her breasts. Botsford then put his hand under her bra and touched her breasts.

Botsford asked if she would let him give her a massage. He told her to lie on her stomach and she did as he requested. Botsford pushed her shirt up as high as he could, until the shirt was around her neck, and he unhooked her bra. Botsford then began to rub her back and reached under her to rub her breasts underneath her bra. Jessie felt uncomfortable, so

she lifted herself off the floor. Botsford told her to sit up so he could rub her shoulders. Jessie sat up and Botsford began rubbing her shoulders, her back, and then reached around to her front and began rubbing her breasts. Botsford then ran his hands down her front and touched around the top of her shorts. Jessie said that everything then went black and she did not remember anything after that.

Jessie did not tell anyone about Botsford touching her, but did tell her sister about Botsford giving her alcohol. At some point, her mother confronted her about drinking at Botsford's house and she was not allowed to go there anymore.

It was not until five years later that she was contacted by Detective Stephen Ives. Detective Ives mentioned Botsford's name and asked Jessie if there was any reason why he might be calling her about Botsford. Jessie told the detective about Botsford giving her alcohol and touching her breasts. After she disclosed the events from the night she spent at the Botsford home, the detective told Jessie about some videotapes he had seen. He showed her still photographs and the videotapes. Jessie identified herself and Botsford in the photographs. She also identified herself in the videotape of her taking a shower when she had spent the night. Jessie said she never gave Botsford permission to photograph, tape, film, or fondle her.

On cross-examination, Jessie said that the mudslide drinks were given to her in a glass about five inches tall and she had about seven or eight of the drinks. She drank them in about fifteen minutes because Botsford told her not to sip them.

The videotapes were of Jessie and Danielle, on separate occasions, taking showers in the Botsford home. Danielle identified the photographs of herself in the Botsford's bathroom, taken when she was between the age of 12 and 14. Danielle testified that she took a shower in the master bathroom and noticed halfway through that the door had been opened maybe a foot and a half wide. She believed someone had opened it. She closed the door and then Botsford came in through the door when she had her dress over her head. She was wearing thong underwear. Botsford said "what kind of underwear are you wearing, missy?" He then walked over to her and grabbed the back of underwear. In doing so, he "touched her butt."

Botsford kept the tapes in a small, portable safe in his home. When Botsford and Bermudez were still living together, Bermudez opened the safe without Botsford's knowledge or permission and removed a videotape and a compact disk which she sent to her mother.

In 2002, the Botsfords separated. In 2003, Bermudez filed for divorce. She retrieved the tape and CD from her mother and gave them to her divorce lawyer. Some months later she and her divorce lawyer viewed the tape and then called the FBI "because there were minors on there." The FBI returned the material saying it was a matter for local authorities. In January of 2005, Bermudez looked at them again and saw that both Danielle and Jessie were shown on them. Bermudez described the images as depicting their bathroom, focusing on the glass shower door. She turned the items over to the local authorities and Detective Stephen Ives was assigned to the investigation. Detective Ives determined, after speaking with both Jessie and Danielle, there was inappropriate physical contact and the criminal prosecution ensued.

At trial, the state provided two *Williams*[1] Rule notices of prior act evidence. The first gave notice that the state intended to introduce into evidence the 1998 touching of Danielle. The second gave notice that the state intended to introduce into evidence the videotape showing the separate showering events of Jessie and Danielle. Defense counsel raised an objection to the admissibility of this evidence in a pretrial hearing and objected again at trial. At trial, defense counsel both renewed his objection to the prior act evidence and submitted a limiting instruction:

> MR. WALKER (defense counsel): Your Honor, I'm presenting to the clerk what is titled stipulation to admit evidence in lieu of live testimony. Mr. Iten and I have agreed to something that the Defense wants to put into evidence in its case. I would guess that the best way to do that would be to have your Honor read this. If you want to take a look at it just ahead of time.

> THE COURT: I can, but at the appropriate time I will read it. Do you fellas have a suggestion when it should be read?

> MR. WALKER: It would be during the Defense case I'm sure, unless Mr. Iten wants to put it in during his case.

> MR. ITEN: No, during the Defense case seems appropriate.

> MR. WALKER: I did provide your Honor just a photocopy of the standard kind of *Williams*-rule cautionary instruction. Previously, I believe in April, Judge Gilner made a ruling allowing what would be similar-fact evidence that the State will present in its case in chief. The language within the cautionary instruction, which I will be requesting, has different alternatives as far as possibilities --

> THE COURT: Okay, let me tell you how Henderson handles that, he puts a period - - I'm no stranger to this instruction - - after where it says "will be considered by you for limited purposes". Now, if you fellas would like to

---

[1] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

explain what those limited purposes are to the jury, during your closings preferably, that's fine. If you have a word or phrase here that you would rather me read to the jury, I will do that. But you're right, sometimes I never know which one of these applies, so I just - -

MR. WALKER: I like your Honor's suggestion, and I would concur with that.

THE COURT: See, I am so - -

MR. WALKER: With the understanding that by concurring to your language I am in no way waiving my objection to the Judge's ruling at the *Williams*-rule hearing, which I will continue to raise.

Incidentally, just so your Honor knows, the Judge did announce at the time he was admitting the similar-fact evidence that it was for the purpose of intent. So my concern would be that if I agree to anything other than intent, that that would be inappropriate. But I much prefer your Honor's - -

THE COURT: So Mr. Iten, Mr. Walker, you fellas want me to inform the jury it's being offered for the limited purposes of proving intent? Or would you rather me just leave it kind of generic and not put words on the end of that phrase.

MR. WALKER: Leave it generic and not put words at the end of that phrase, is I'm sure what Mr. Iten is going to agree to.

MR. ITEN: That is correct. It's a Defense requested instruction, I'll defer to the Defense as to how they want it presented.

THE COURT: Okay.

Transcript, Ex. 1, pp. 110-113.

At the appropriate time during trial, the trial court gave the following stipulated instruction:

THE COURT: Is this where I give the limitation instruction?

MR. WALKER:  If I could, with regard to that stipulation, that does preserve my prior objection.

THE COURT:  Prior objection, certainly, sir.
Members of the jury, the evidence that you have been hearing about, to some degree -- the tape, the disc, the photos, so forth -- you are about to receive, concerning evidence of other crimes allegedly committed by the defendant, shall be considered by you for limited purposes, which purposes shall be addressed by the attorneys during their closing arguments.  However, the defendant is not on trial for these alleged other crimes, he is on trial solely for the single crime of molestation charged by the State, which shall be explained to you in greater detail by myself later.  Okay?  All right, so they are received.

Transcript, Ex. 1, p. 252.

## Procedural History

Botsford was sentenced on October 30, 2006, to seven years imprisonment followed by five years sexual offender probation.  He appealed on the issue of whether the trial court erred by allowing the state to introduce prior act evidence of the touching and videotaping.  The appellate court *per curiam* affirmed the conviction.  *Botsford v. State*, 965 So. 2d 1147 (Fla. 2d DCA 2007) [table opinion].

Botsford filed for post-conviction relief asserting eleven grounds for relief, including the five grounds of ineffective assistance of counsel raised in the instant petition.  The post-conviction court summarily denied all grounds but one, which it dismissed without prejudice allowing Botsford thirty days to file an amended motion.  Botsford filed a "Motion Waiving Amendment to Ground Three; Motion for Rehearing on All Other Grounds Summarily Denied."  The post-conviction court entered a final order denying that motion.

Botsford appealed. The appellate court *per curiam* affirmed. *Botsford v. State*, 54 So. 3d 978 (Fla. 2d DCA 2011) [table]. Botsford then timely filed the instant petition with this Court raising the following grounds:

**Ground One:** Deprivation of Fifth, Sixth, and Fourteenth Amendment rights as secured by the United States Constitution through inadmissible *Williams* Rule evidence.

**Ground Two:** Deprivation of Fourth, Sixth and Fourteenth Amendment rights as secured by the United States Constitution through ineffective assistance of counsel for failing to:

    A. Move to suppress *Williams* Rule evidence obtained by theft from defendant's safe by wife without permission;

    B. Challenge pre-trial veracity of Jennifer Botsford's testimony regarding ownership, production and/or authentication of other bad act evidence and present reverse *Williams* Rule evidence challenging motive;

    C. Investigate, secure, and call for trial witnesses whose presentation and testimony was critical to the defense; and

    D. Correctly advise Defendant and coercing him not to testify in his own defense.

## Standard of Review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective as of April 24, 1996, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." 28 U.S.C. § 2254(a). The Supreme Court has

cautioned that § 2254 does not make federal courts "forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 77 L.Ed.2d 1090 (1983).

Where a state court initially considers the issues raised in the petition and enters a decision on the merits, Section 2254(d) governs the review of those claims. *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L.Ed.2d 9 (2001). A federal court may grant a § 2254 petition only if (1) the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See Price v. Vincent,* 538 U.S. 634, 638, 123 S. Ct. 1848, 155 L.Ed.2d 877 (2003); *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

The Eleventh Circuit Court of Appeals discussed the meaning of the "contrary to" and "unreasonable application" clauses in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

Section 2254 establishes a highly deferential standard for reviewing state court judgments. *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003). If a federal court concludes that a state court applied federal law incorrectly, it may grant habeas relief only if that application was "objectively unreasonable." *Id. See also Yarborough v.*

*Gentry*, 540 U.S. 1, 124 S. Ct. 1, 4, 157 L.Ed.2d 1 (2003). Moreover, under Section 2254(e)(1), a state court's factual findings shall be presumed correct, and the habeas petitioner can rebut the presumption of correctness only by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052. *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court

deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. at 690.

Petitioner must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691-92. To meet this burden, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

## Discussion

**Ground One:** Deprivation of Fifth, Sixth, and Fourteenth Amendment rights as secured by the United States Constitution through inadmissible *Williams* Rule evidence.

In support of Ground One, Botsford argues that the trial court erred in admitting the prior bad act evidence because it was neither relevant to a fact in issue, nor similar to the act of the charged offense. He contends that the trial court misapplied federal law.

To prevail, Botsford must show not only that the trial court erred, but that it unreasonably applied federal law in doing so. 28 U.S.C. § 2254(d)(1). This is a difficult standard to meet. This is particularly so concerning the admissibility of prior bad act

evidence because a trial court has broad discretion in weighing that issue. *United States v. Crawford*, 413 F. 3d 873 (8th Cir. 2005).

For most crimes, the rules of evidence prohibit the admission of evidence for the purpose of showing a defendant's propensity to commit bad acts. But there is an exception for child molestation cases under both Florida and federal law. This exception has been specifically authorized by the legislative branches of each government.

The Court begins its analysis with the state statute under which Botsford was charged, Florida Statute § 800.04(5)(a):

> (5) **Lewd or lascivious molestation --**
> (a) A person who intentionally touches in a lewd or lascivious manner the breasts, genitals, genital area, or buttocks, or the clothing covering them, of a person less than 16 years of age, or forces or entices a person under 16 years of age to so touch the perpetrator, commits lewd or lascivious molestation.

Florida's general rule about the admissibility of prior bad act evidence is found at Florida Statute 90.404(2)(a):

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

Florida's legislative exception to that rule for child molestation cases is found at Florida Statute 90.404(2)(b):

> 1. In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

2.     For purposes of this paragraph, the term "child molestation" means conduct proscribed by s. 794.011 or s. 800.04 when committed against a person 16 years of age or younger.

For child molestation cases in the state of Florida, then, prior bad act evidence "is admissible, and may be considered for its bearing on any matter to which it is relevant." *Id.* In Botsford's case, the trial court determined that the prior acts of touching the buttocks of Danielle, which itself was child molestation under the Florida Statute, and the videotaping of the two girls under age 16 while showering, were relevant to Botsford's intent concerning the issue of whether he touched Jessie's breasts. It is for this Court on federal review to decide, not whether the state trial court erred in admitting the evidence under Florida law, but whether the state trial court unreasonably applied clearly established federal law in doing so.

The admissibility of prior bad act evidence under federal law is covered by Federal Rule of Evidence 414. In *United States v. Hollow Horn*, the Eighth Circuit discussed the effect of Rule 414 as follows:

"Evidence of prior bad acts is generally not admissible to prove a defendant's character or propensity to commit crime." *Gabe*, 237 F. 3d at 959 (citing Fed.R.Evid. 404(b)). Congress, however, modified this rule in sex offense cases when it adopted Rules 413 and 414 of the Federal Rules of Evidence. *Id.* In sexual assault and child molestation cases, "evidence that the defendant committed a prior similar offense 'may be considered for its bearing on any matter to which it is relevant,' including the defendant's propensity to commit such offenses." *Id.* (citing Fed.R.Evid. 413(a), 414(a)); *see also Crawford*, 413 F. 3d at 875 ("Assuming the prior [sex] offenses are relevant, Rule 413 supersedes Rule 404's prohibition against character evidence."). If the evidence of the defendant's prior sexual offense is relevant, "the evidence is admissible unless its probative value is 'substantially outweighed' by one or more of the factors enumerated in Rule 403, including 'the danger of unfair

prejudice.'" *Gabe*, 237 F. 3d at 959 (citing *United States v. LeCompte*, 131 F. 3d 767, 769 (8th Cir. 1997)).

523 F. 3d 882, 887 (8th Cir. 2008) (footnote omitted).

Federal Rule of Evidence 414 provides in pertinent part:

(a)    In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

\* \* \*

(d)    For the purposes of this rule and Rule 415, "child" means a person below the age of fourteen, and "offense of child molestation" means a crime under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved --

\* \* \*

(2)    any conduct proscribed by chapter 110 of title 18, United States Code;

The federal statute covering child molestation, found at 18 U.S.C. § 2244(a)(3), makes "sexual contact" a crime under the same conditions as a "sexual act" under § 2243.

18 U.S.C. § 2243(a) provides:

Whoever knowingly engages in a sexual act with another person who -- (1) has attained the age of 12 years but has not attained the age of 16 years; and (2) is at least four years younger than the person so engaging; or attempts to do so shall be fined under this title, imprisoned not more than fifteen years, or both.

"Sexual contact" is defined in 18 U.S.C. § 2246(3) as follows:

The term "sexual contact" means the intentional touching, either directly or through the clothing, of the . . . breast . . . or buttocks of any person within an intent to . . . arouse or gratify the sexual desire of any person.

Thus, the touching of Danielle's buttocks constituted child molestation under federal statute 18 U.S.C. § 2244(a)(3), and was admissible as evidence under Federal Rule 414. And Rule 414 includes offenses of child pornography (Chapter 110 of title 18, U.S.C.) within its definition of child molestation. Specifically, 18 U.S.C. § 2252A(a)(4), a part of Chapter 110, makes it a crime to possess child pornography. Therefore, the CD containing nude pictures of the girls under fourteen (Jessie and Danielle) is admissible under Rule 414 as well.

The Tenth Circuit explained the purpose for Rule 414 in *United States v. Batton* as follows:

> Just as Rule 413 permits the introduction of prior offenses of sexual assault evidence, Rule 414 similarly allows the admission of evidence of prior offenses in child molestation cases. As we noted in *United States v. Enjady*, 134 F. 3d 1427 (10th Cir. 1998), Congress enacted these rules because these types of cases often raise questions regarding the victim's credibility and a defendant's prior conduct can be especially probative. *Id*. at 1431. Additionally, the rules are "based on the premise that evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes." *Id.*

602 F. 3d 1191, 1196 (10th Cir. 2010).

Even if these pictures and testimony had not been admissible under Rule 414, evidence of prior bad acts which do not fit within the boundaries of Rule 414 may still be admissible under the general rule of Federal Rule of Evidence 404(b):

> (b) **Other Crimes, Wrongs, or Acts. --** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or

during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

For example, the Ninth Circuit has held that prior bad act evidence may be admitted to show why a victim did not report the abuse right away, an argument Botsford's counsel made in questioning the credibility of Jessie. *See U. S. v. Garcia*, 148 Fed. Appx. 594, 595-596 (9th Cir. 2005).

In sum, the state trial court did not unreasonably apply federal law in admitting the prior bad act evidence because the evidence would be permitted under Federal Rules of Evidence 414 and 404(b).  Therefore, Ground One fails on the merits.

**<u>Ground Two:</u>**   Deprivation of Fourth, Sixth and Fourteenth Amendment rights as secured by the United States Constitution through ineffective assistance of counsel for failing to:

> A.    Move to suppress *Williams* Rule evidence obtained by theft from defendant's safe by wife without permission.

In support of Ground Two A, Botsford asserts that he:

> urged defense counsel to move for suppression of the videotapes/CDs the state intended to use as *Williams* rule evidence because it was obtained by theft from Defendant's safe by his ex-wife without permission in violation of his Fourth Amendment rights. . . . (T)here was no proof that the tapes/CDs had even come from his safe, that Mrs. Botsford was well aware the couple had purchased a nanny cam for the purpose's (sic) of observing babysitters while they bathed or tended to their three children.  Thus, Petitioner Botsford urged counsel to challenge pre-trial the authentication of the evidence, counsel refused to do so, Petitioner Botsford contends that his counsel's failure to challenge the validity of the states (sic) *Williams* rule evidence, and chain of custody, under suppression was an action by counsel that "fell below an objective standard of reasonableness."

First, it appears from the record that Botsford is factually incorrect. The statements of counsel at the beginning of trial concerning the stipulation for the reading of the limiting instruction indicates that defense counsel had objected at a pre-trial hearing to the introduction of the *Williams* Rule evidence. In submitting the proposed limiting instruction to the court, defense counsel renewed his objection. And he made sure that he was not waiving the objection by submitting the proposed limiting instruction. The trial court acknowledged on the record that defense counsel was not waiving his prior objection.

Second, this claim fails because, even if defense counsel had failed to move to suppress the evidence pre-trial, Botsford cannot show prejudice. As the state post-conviction court pointed out, any such pre-trial motion would have been denied. The post-conviction court said:

> The Fourth Amendment recognizes the right to be protected from the *government's* unreasonable searches and seizures. "Because the exclusionary rule in respect to Fourth Amendment violations is based upon the deterrence of illegal police or prosecutorial action, *it is not triggered by the actions of private persons however egregious they may be."* Thus, the allegation that the videos and CD evidence were stolen by the Defendant's ex-wife does not provide a valid basis for suppression. Nor was there any allegation of improper antecedent conduct by law enforcement or that the Defendant's ex-wife acted as an agent, directly or indirectly, for law enforcement. Rather, Bermudez's trial testimony indicated that she opened the safe of her own volition, removed the videos and CD, sent them to her mother for safekeeping, viewed them with a divorce attorney at a later date, and turned them over to law enforcement after the divorce was finalized.

Ex. 7, Order Denying Post Conviction Relief, p. 4. (footnotes omitted).

In denying Botsford's claim, the state post-conviction court was correct that the Fourth Amendment applies to law enforcement conduct, not to private third parties, unless

the third party is shown to be law enforcement's agent.  As the Supreme Court explained in

*Stone v. Powell*, 428 U.S. 465, 486 (1976):

> The primary justification for the exclusionary rule then is the deterrence of
> police conduct that violates Fourth Amendment rights.  Post-Mapp Decisions
> have established that the rule is not a personal constitutional right.  It is not
> calculated to redress the injury to the privacy of the victim of the search or
> seizure, for any "(r)eparation comes too late." *Linkletter v. Walker*, 381 U.S.
> 618, 637, 85 S. Ct. 1731, 1741, 14 L. Ed. 2d 601 (1965).

Because Botsford is factually incorrect in his assertion underlying this ground, and

because the post-conviction court properly applied federal law in denying the claim, this

ground will be denied for lack of merit.

           **B.**      Challenge pre-trial veracity of Jennifer Botsford's testimony
regarding ownership, production and/or authentication of other
bad act evidence and present reverse *Williams* Rule evidence
challenging motive.

In support of Ground Two B, Botsford asserts he:

urged defense counsel to challenge the veracity of Jennifer Botsford's
testimony regarding ownership, production and/or authentication of other bad
act evidence, and present Reverse *William's* rule evidence challenging her
motive and ability to alter the tapes/CD's before turning them over to law
enforcement.   Botsford informed counsel of the following facts concerning
Mrs. Botsford's trustworthiness, motive and reasoning for pursuing the case
against him, that this fact concerning Mrs. Botsford's motive could be verified
alone by the date she had sole possession of tapes/CD's, including the third
parties (i.e. Nydia Bermudez and Greg Kaiser) who had sole possession of the
tapes/CD's.  Nydia Bermudez was Jennifer's mother and Greg Kaiser was the
attorney handling the divorce proceedings between the Botsfords, Mrs.
Botsford's mother had sole supervised possession of the tapes/CD's for three
years.  Mrs. Botsford then retrieved the tapes/CD's from her mother and turned
them over to Greg Kaiser who had sole unsupervised possession of them for
three months.  Petitioner Botsford explained to counsel that Mr. Kaiser had
reason to cause harm to Mr. Botsford.  Mr. Greg Kaiser removed himself from
their divorce case when Mr. John Strickland, Mr. Botsford's divorce attorney,

broached the subject of ethic violations Mr. Kaiser and Mrs. Botsford were involved in a personal affair. Mr. Kaiser returned the tapes/CD to Mrs. Botsford. The tapes/CD were eventually turned over to law enforcement at a time when Mrs. Botsford found out that Mr. Botsford wanted sole custody of their children. Counsel informed Mr. Botsford that he would utilize these facts at trial and have the tapes examined by experts. The record reflects that counsel did neither.

Petitioner Botsford contends that he satisfied the required two prong test of *Strickland* as required under clearly established federal law. (See memorandum of law).

Botsford contends, the state trial court's summary denial was an "objectively unreasonable decision" in light of unrefuted facts contained in the sworn motion. Additionally, Botsford contends that the state district appellate courts' "*per curiam* affirmance" resulted in a decision that was "contrary to" or involved an "unreasonable application" of clearly established federal law as determined by the United States Supreme Court.

Therefore, this federal court, after a full review of the record evidence, should reverse the petitioner's conviction as being in violation of the constitution, its law, or treaties of the United States.

Petition (Dkt. #1), p. 10-11.

Botsford misstates the record in making this claim. Bermudez, Botsford's ex-wife, in her direct testimony, explained how she obtained the tapes/CDs and the various hands they passed through before they finally reached local law enforcement. And on cross-examination, defense counsel tested her credibility. On direct, Bermudez testified that she could have used the pictures and CDs in regard to custody issues, but did not because she did not want them to be part of the divorce. On cross, defense counsel got her to admit that she filed papers to modify custody and child support within a week or so after Botsford was arrested. (Transcript, Ex. 1, p. 218.) Thus, contrary to Botsford's claims, defense counsel

effectively demonstrated Bermudez's motives against Botsford to improve her chances in the divorce and child custody proceedings.

Additionally, defense counsel effectively demonstrated to the jury that Bermudez knew about the nanny cam through the testimony of Heather Poole. Ms. Poole described how the videotape of the victims was made:

BY MR. WALKER (defense counsel):

Q: Just briefly, since Mr. Iten brought this up, did Mr. Botsford talk to you about the tape of Jessie?

A. He did.

Q. How did he explain that that tape was made?

A. He said that it was a nanny cam that he had in the bathroom. They had it where it would watch the bathtub because they had an experience years before with one of their children where they felt like something had happened, and it was having to do with the baths. So they had a nanny cam that would face the bathtub. He mentioned that - - he said that he had the camera facing the bathtub, a portion of it caught the mirror and caught the shower. He said that it was unintentional, he said that he saw what was on the tape, handed it to Jennifer, and asked her to dispose of it.

MR. WALKER: I have nothing further, your Honor.

Transcript, Ex. 1, pp. 350-351. When the state called Bermudez to rebut this testimony, Bermudez admitted, on cross, that she was aware of the nanny cam.

As for Botsford's claims about his counsel's failure to hire an expert to review the tapes/CDs, Botsford merely speculates that the items could have been altered. He points to no specific evidence of tampering, nor does he even point to any part of the tapes that were

shown in court that appeared to him to have been altered in any way. Mere speculation is insufficient to support a claim for habeas review.

The state post-conviction court correctly denied this claim for lack of merit. Botsford has failed both prongs of *Strickland* -- he has not shown any deficient performance on the part of his counsel, nor has he shown prejudice resulting from any of the claims made in this ground. Therefore, Ground Two B will be denied for lack of merit.

> C. Investigate, secure, and call for trial witnesses whose presentation and testimony was critical to the defense.

In support of Ground Two C, Botsford states:

Botsford asserted in his state post conviction motion that his counsel failure to investigate, secure, and call for trial defense evidence and witnesses who presentation and testimony was critical to the defendant's and the failure to do so did prejudice the defense.

In fact, prior to trial Petitioner Botsford informed counsel of several witnesses (i.e. Sandra and Rick Curtis and Tara Hagan) that were available for trial and would have testified to the following:

The first witnesses, Sandra and Rick Curtis, were the defendant's parents and would have testified that they had visited the Botsford's home in early July of 1999. That during that visit, Mrs. Botsford had shown the Curtis's newly purchased nanny cam, explaining that its purpose was to monitor the house keepers and baby sitters in the handling of the couples minor children during restroom and showering routines, where the middle son (JMB) had suddenly refused to let a hired nanny bathe him. As such, the Botsford's decided to purchase the nanny cam after talking with another couple (Shawn and Chris Ryan). Mrs. Botsford also explained to the Curtis's how the couple found and purchased the nanny cam. The Curtis's testimony concerning the exchange with Mrs. Botsford, had it been placed before the jury, would have refuted Mrs. Botsford's testimony of having no knowledge of the nanny cam what so ever. Moreover, the defendant presented counsel with a purchasing receipt from the couple's joint credit card account that itemized the nanny cam. Counsel was also informed of Mrs. Botsford's signature being on the UPS

receipt as she had signed for the nanny cam when it was delivered. The Curtis's would have also testified to the jury of Mrs. Botsford's numerous threats to "get even" with the defendant, threats made during the three year divorce period. Counsel was provided with the Curtis's home and cell phone numbers. Counsel was urged to contact them, and that they were available and willing to testify. Deleteriously, counsel informed defendant that they were not needed. The case proceeded to trial without the Curtis's or the itemized account and UPS receipt concerning the nanny cam.

Tara Hagan was an executive assistant of the defendant at his previous employer. Ms. Hagan was willing to testify as to the defendant telling her two years before being charged about he and Mrs. Botsford buying the nanny cam. She would have testified that the defendant's story had not changed after the arrest. Tara Hagan's testimony would have corroborated with the Curtis's testimony had the Curtis's been investigated and called.

Petition (Dkt. #1), pp. 11-12.

This ground fails because Botsford fails to show deficient performance on the part of his counsel. His parents' testimony to show that Ms. Bermudez knew about the nanny cam was superfluous because Bermudez admitted on cross that she knew about the nanny cam. And the testimony of Tara Hagan on this issue would have been inadmissible hearsay because statements made by a defendant to other persons are not admissible except under very limited circumstances, none of which are present here. Therefore, counsel was not deficient for failing to call these witnesses.

Furthermore, Botsford does not show prejudice. As the post-conviction court correctly noted, the prime evidence against Botsford was the testimony of the victim in describing the circumstances surrounding the touching of her breasts. Testimony from Botsford's parents or other witnesses that Bermudez knew of the nanny cam would not have detracted from this testimony.

For the foregoing reasons, Ground Two C lacks merits and will be denied.

>           D.     Correctly advise Defendant and coercing him not to testify in his
>                  own defense.

In support of Ground Two D, Botsford claims:

> In fact, during pre-trial stages both the defendant and counsel agreed that
> petitioner's testimony was required. His testimony would refute Mrs.
> Botsford's statement that she had no knowledge of a nanny cam, that it was
> purchased on their joint credit account and that she signed for receipt of the
> camera when it was delivered by UPS. Further, the petitioner would have
> testified the [sic] Mrs. Botsford was the person to always review the contents
> of the nanny cam upon returning home from the couples outings. That when
> both he and Mrs. Botsford realized that "Jesse (last name omitted)" was
> captured on the nanny cam tape, the tape was removed and taken by Mrs.
> Botsford. Mrs. Botsford was the one to have disposed of the tape. Moreover,
> the petitioner would have testified as to Mrs. Botsford's hostilities and threats
> towards petitioner when he initiated the child custody issue.
>
> The petitioner has no prior felony record, had an exemplary career as a bank
> president, served as a member of the board of directors for four non-profit
> organizations, and was generally considered to be an upstanding citizen in his
> community. The night before his scheduled testimony, counsel called
> petitioner (3) times and threatened him not to testify because he, counsel, had
> the trial won and his testimony would at that point only risk harming their
> victory. Petitioner argued with counsel adamantly, refusing counsels advice.
> The next day, counsel took him into the court library and again threatened
> petitioner that his testimony was not necessary as the case had already been
> won. Counsel even stated that the Judge's assistant had told Counsel that there
> was no way the jury would convict Mr. Botsford. Counsel stated to Petitioner
> Botsford that the Judge's assistant stated, "the state failed to prove its case".
> Ultimately counsel's coercion prevailed and petitioner did not testify.

Petition (Dkt. #1), p. 13.

This claim is belied by the record. Specifically, the trial court explained to Botsford

that it was his decision, not his lawyer's, with respect to whether he should testify. His

lawyer could only offer advice.  The record is also clear that Botsford understood and made

his own decision:

> MR. WALKER:   Your Honor, I'm going to ask that you do an inquiry of Mr. Botsford regarding the decision that we have come to about his exercising his right to remain silent.

> THE COURT:   Okay.

> MR. WALKER:   There needs to be an inquiry by the Court.

> THE COURT:   I know that.  Is he not planning on testifying?

> MR. WALKER:   At this point - - and I must say it is a situation where we've - - we started discussing this yesterday at lunchtime, we discussed it last night, we've gone back and forth with several things, I think it is an extraordinary difficult decision for Mr. Botsford.  Likewise it is for his counsel.  Mr. Botsford has indicated to me that he is going to defer to my thoughts on this, and I believe - - and I've given him my thoughts, and I do believe he is consenting to what I believe is the best tactical decision on his behalf, a decision that if he follows and if he is convicted he's never ever going to forget.

> I, as his counsel, probably have influenced him against what would be his intuition.  So I think that we need to make - - your Honor, for the record, has to develop that.

> THE COURT:   Okay, I couldn't agree more.

> Mr. Botsford, Steve just said a lot of things, but the bottom line is you have a right to be sworn in like any other witness and sit up here and testify.  And of course you'd be subject to cross-examination by Mr. Iten.  You have a right not to testify, and Mr. Iten cannot comment on that.  Is it your decision, from what I hear from Mr. Walker, not to take the stand and testify?

> THE DEFENDANT:   Yes, your Honor.

> THE COURT:   All right, sir.  And you understand you can.

> THE DEFENDANT:   Yes, your Honor.

THE COURT:   And nobody's threatened you with anything.  Sounds like you and him have discussed this thoroughly, and it's your decision not to testify.

THE DEFENDANT:   That's right.

THE COURT:   All right, sir.  I will so note that for the record.

MR. ITEN:   And just in an abundance of caution, given the lengthy statement Mr. Walker made that gave us a lot of insight to how defendant reached his decision, I would just like the Court to make it perfectly clear that at the end of the day this is the defendant's decision, that he can consider advice from counsel but he cannot advocate his responsibility to his lawyer, that this is ultimately a decision only - -

THE COURT:   You know, we're going to make speeches in here.

MR. ITEN:   - - Mr. Botsford can make, he has to waive it.

THE COURT:   Listen, is this your decision, Mr. Botsford?

THE DEFENDANT:   Yes, your Honor.

THE COURT:   Okay.  And what Steve was pointing out, that if this thing was to go - - if the jury came back guilty, for instance, you were to be appeal, it would be extremely difficult - - after me and you have been having this conversation, plus what he put on the record - - of convincing an appellate court that Mr. Walker talked you into this or - - because you have a right to testify.

THE DEFENDANT:   I understand.

THE COURT:   He can only advise you, and then you're the one that gets to make the final call whether to take the stand.

THE DEFENDANT:   Yes, sir.

THE COURT:   All right, sir. And having that in mind, you're willing to - - you're not desirous of testifying.

THE DEFENDANT:   Correct.

Transcript, Ex. 1, pp. 324-327.

The record clearly demonstrates that defense counsel did not coerce, threaten or misadvise Botsford about whether to testify. This ground will be denied because Botsford has failed to show deficient performance on the part of his counsel.

## Conclusion

Because all grounds raised in the petition lack merit, the petition is due to be denied.

It is therefore ORDERED AND ADJUDGED that:

1.      The petition for writ of habeas corpus (Dkt. #1) is DENIED.

2.      The Clerk is directed to enter judgment in favor of Respondents and against the Petitioner, terminate any pending motions, and close this file.

### CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,"

*Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Tampa, Florida on March 7, 2012.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies Furnished To**:
Counsel/Parties of Record

*F:\Docs\2011\11-cv-1025.deny 2254.wpd*